UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Danziger Kosher Tours, LLC,                     CIVIL ACTION
Stuart Morginstin,                                Case No.
      Plaintiffs,

v.

Corporacion Hotelera Hispano Mexicana, S.A. de C.V.,
and Melia Hotels International, S.A.,

      Defendants.
_____/

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND MONEY DAMAGES**

Danziger Kosher Tours, LLC ("Danzinger") and Stuart Morginstin ("Morginstin", together with Danzinger, the "Plaintiff"), by and through undersigned counsel, sues the Defendants Corporacion Hotelera Hispano Mexicana, SA de CV ("CHHM") and Melia Hotels, International ("Melia", together, the "Defendants") and respectfully states:

        I.        **PARTIES, JURISDICTION, AND VENUE**

        A.  **Parties**

1. Danzinger is a Florida limited liability company engaged in promoting and hosting kosher tours and related business endeavors.

2. Morginstin is a person residing in Florida and is otherwise sui juris.

3. Plaintiff is informed and believes, and based thereon alleges, that at all material times, Melia is a public limited liability company headquarter in Spain. Plaintiff is informed and believes, and based thereon alleges, that at all material times, Melia is one of the largest hotel chains worldwide, operates approximately 374 hotels in 40 countries under the current or former brands Melia, Gran Melia, ME by Melia, Paradisus, Innside by Melia, Sol by Melia and Affiliated by Melia. Plaintiff is informed and believes, and based thereon alleges, Melia operates hotels in

the United States, including in New York and Florida, and regularly transacts business in Florida, including in connection with the matters at issue herein.

4. Plaintiff is informed and believes, and based thereon alleges, that at all material times, CHHM is a Mexican corporation, a wholly owned subsidiary of Melia, operator of, among others the Hotel Paradisus Playa del Carmen – Riviera Maya and Paradisus Perla (together, the "Hotel"), and regularly transacts business in Florida, including in connection with the matters at issue herein.

B. **Jurisdiction and Venue**

5. Jurisdiction and Venue are property in the Southern District of Florida.

6. Diversity jurisdiction is proper here as Plaintiff is a Florida limited liability company, defendant Melia is incorporated in Spain, and CHHM is incorporated in Mexico.

7. Venue is proper in this district because the Defendants transact business in the Southern District of Florida, Defendants directed Plaintiff to transfer funds their accounts in Miami, FL, Defendants made demand upon Plaintiffs in the Southern District of Florida, and Defendants' wrongful acts were committed in the Southern District of Florida; and the amount in controversy in this action exceeds $75,000.

II. **General Allegations**

8. On or before May 2022, Plaintiff engaged Hospitality Performance Network Global ("HPN Global") to assist with identifying and negotiating the terms of a hotel buy-out (a "Buyout") for its 2023 Passover event (the "Passover Program").

9. A Buyout is when an entity (a "Buyout Client") reserves an entire hotel on behalf of a group, including all of the accommodations therein, for a given period of time to obtain has exclusive use of same. Under a Buyout, a Buyout Client guarantees a fixed price for such

exclusivity and has rights to use all accommodations, including all hotel rooms, as part of the fixed price irrespective of the number of actual guests that will be using such accommodations. Unlike other block billing clients, because a Buyout Client acquires every room in the respective hotel and guarantees payment of same, Buyout agreements do not contain, among other provisions, "no-show" or "early departure" terms, per guest room rates, or other provisions that would be common in non-Buyout agreements.[1]

10. Plaintiff is in the religious event planning industry, focused of delivering high quality experiences during the Jewish high holiday of Passover.

11. The Passover Program is a beautiful and family-friendly 14-day destination conference, including educational components, religious services, child care/camp, specially prepared meals, entertainment and other events. See Exhibit "1" Brochure for event.

12. The Passover Program requires hundreds of staff, including religious advisors, entertainers, camp staff, kitchen staff, administrative staff, and others.

13. Plaintiff's business model includes negotiating with a host hotel for block room reservations (in this instance, it was an entire Buyout of every room in the Hotel).

14. Plaintiff then markets its Passover Program to contract with attendees to attend and pay for the Passover Program (including accommodations).

15. The Passover Program caters largely to observant Jews ("Attendees") who generally follow strict religious laws throughout the Jewish holiday of Passover (the "Passover Rules"), including certain dietary restrictions ("Kosher Rules").

16. Among other observances, during Passover the Attendees participate in religious services and ceremonial dinners on the first two nights of Passover (each, a "Seder").

---

[1] The complete terms of the agreement were memorialized in a final contract dated October 9, 2022 (the "Final Contract") attached hereto as Exhibit "2".

17. The Seder is a hallmark of Passover and one of the most important ritual services to the Attendees.

18. The Passover Program was to take place with a check-in date of April 2, 2023, and a check-out date of April 14, 2023 (the "Program Dates"). Outside of the Program Dates, guests were entitled to arrive up to 3 days early, or extend up to 3 days after, at certain separate fixed per-person rates. All of the hotel rooms were pre-paid for by Plaintiff during the Program Dates as a function of the Buyout.

19. Among other things, HPNG was tasked with identifying a location that would be able to follow the Passover Rules, the Kosher Rules, assist in hosting the religious ceremonies, and otherwise provide rooms and Accommodations for the Attendees and Plaintiff's staff.

20. The host hotel location was required to be of appropriately high standards to meet with Attendee's expectations.

21. On or before May 2022, HPN Global responded to the marketing efforts of the Defendants and commenced communications with Carlos Sosa ("Sosa"), a Director of Sales, Meetings & Events, West Coast USA, for Melia.

22. Sosa directed Plaintiffs and HPN Global to explore an opportunity to host the Passover Program at the Hotel.

23. Sosa also assisted Plaintiff and HPN Global in negotiating terms for a Buyout of the Hotel.

24. In addition to Sosa, communications between HPN Global agents and the Plaintiffs included, among others, the following representatives of Melia and CHHM: (i) Rodrigo Martinez Manso, Corporate International Group Sales Manager, Meetings and Events Mexico ("Manso"); (ii) David Kumul, Group Sales & Planning Manager Mexico ("Kumul"); (iii) Annette Koelemeij,

General Manager of the Hotel ("Koelemeij"); (iv) Angel Gutierrez, Groups Concierge for the Hotel ("Gutierrez"); and (v) Roberto Romero, Corporate Director of Group Sales, Melia Hotels International – Mexico ("Romero").

25. On or about May 24, 2022, Sosa informed Plaintiff that the Hotel "allows the full buyout of the 900 suites for your Passover group."

26. On or about June 7, 2022 through June 9, 2022, Plaintiff conducted a site visit to the Hotel to meet in person with Manso and others to discuss the Passover Program (the "June 2022 Site Visit").

27. During the June 2022 Site Visit, Plaintiffs met with, among others, Sosa, Manso and other representatives and agents of Defendants.

28. Also during the June 2022 Site Visit, Plaintiffs discussed, among other things, the staffing requirements for the Passover Program.

29. Also during the June 2022 Site Visit, Plaintiffs advised, among other things, that in addition to Attendees, Plaintiff would be bringing its own staff members including chefs, kitchen staff, lecturers, rabbis and other religious service providers, babysitters, nannies, camp counselors, administrative staff, and others (the "Program Staff").

30. At all relevant times, it was understood that in addition to Attendees, Plaintiffs would be accompanied by its Program Staff.

31. Thereafter, on or about June 17, 2022, Manso corresponded with Plaintiff and HPN Global and informed them of, among other deal points, "The Hotel will be providing the total room inventory per room category, how many connecting rooms the Hotel has, how many with King size and how many with two double beds, and what is the maximum occupancy per room the Hotel will accepted on a full buy out and the total amount of guests the hotel can handle to provide a

great service. Danziger Kosher will be Selling every rooms per category and per location*.*" *See* Exhibit "3", June 17, 2022, Manso email ("Email 1").

32.   In Email 1, Manso also acknowledges that in addition to "guests" of the Passover Program, i.e., Attendees, Plaintiff would be bringing its own Program Staff including, among others, "a team of experience Mexican chefs as task force during the program to assist the Hotel in the kitchen…" *See* Email 1.

33.   On or about June 27, 2022, Manso corresponded with Plaintiff and HPN Global and delivered a proposal for, among other things, a full Buyout of the Hotel "899 rooms for 12 nights" with a "**MAXIMUM OCCUPANCY per room will be 2 Adults and two children (12 years and younger) or 3 Adults (13 Years and older) and One child (12 years and Younger) – 4 Adults ARE NOT ALLOWED.**"   *See* Exhibit "4", June 27, 2022, Manso email ("Email 2").

34.   The "Rates per additional guests" proposal of Email 2 were rejected and not made a part of the Final Contract.

35.   On the weekend of July 9, 2022, Sosa attended a Melia company meeting in Orlando, Florida.

36.   On or about July 17, 2022 through July 19, 2022, Plaintiff conducted a site visit to the Hotel to meet in person with Manso and others to discuss the Passover Program (the "July 2022 Site Visit").

37.   During the July 2022 Site Visit, Plaintiffs met with, among others, Sosa, Manso and other representatives and agents of Defendants.

38.   Also during the July 2022 Site Visit, Plaintiffs reiterated, among other things, the Program Staff required to support the Passover Program.

39. Also during the July 2022 Site Visit, Plaintiffs reiterated, among other things, that in addition to Attendees, Plaintiff would be bringing its own Program Staff.

40. On July 26, 2022, Sosa sent an email to HPN Global asking, among other questions, the anticipated number of guests, nannies, butlers, and for an agenda. *See* Exhibit "5", July 26, 2022, Manso email ("Email 3").

41. Email 3 was forwarded to Plaintiffs by HPN Global on July 26, 2022.

42. In response, Plaintiff responded to HPN Global, as follows, "*lets discuss tomorrow, as some of those questions have no bearing, since this is 900 rooms we are paying for so we need to market to accommodate that, in the past we had a room block of 300 rooms and sold 400, as the hotel would not sell us more. due to the fact we were not a buyout.*" *See* Exhibit "6", July 26, 2022, Morginstin email ("Email 4").

43. On July 28, 2022, HPN Global advised Sosa, among other things, "This is a buyout with no attrition - history is not applicable"  *See* Exhibit "7", July 28, 2022, HPN Global email ("Email 5").

44. In Email 5, HPN Global also advised Sosa, among other things, that Plaintiff anticipated approximately 1500 adult guests, 500 children and "potentially need 100 nannies … We view a nanny as a babysitter…". *See* Email 5.

45. In response to Sosa's inquiry: "Will Stuart need pre nights? If so, how many nights and how many guests/sleeping rooms?", HPN Global advised: "Pre nights would only be for staff and rabbis. Maybe 20-30 rooms each night …". *See* Email 5.

46. To incorporate this comment and as a product of further negotiations, the final signed October 10, 2022 contract provides, "**Baby sitter service will not be provided by the Hotel.**" Final Contract page 6 (emphasis in original).

47. On or around August 3, 2022, Sosa delivered a spreadsheet further detailing the hotel accommodations including the maximum capacity per hotel room type (the "Spreadsheet"). Exhibit "8". Pursuant to the Spreadsheet, the Hotel Buyout maximum capacity allowed for 1,798 adults and 1,127 minors.

48. On or about August 12, 2022, Plaintiffs participated in a video conference with, among others, Manso, Sosa, Koelemeij, Roberto Romero Garcia ("Garcia") and HPN Global (the "August Video Conference").

49. During the August Video Conference, Plaintiffs explained that during the Passover Program that Plaintiff would bring its own staff totaling approximately 300 people that would be separate from and in addition to Attendees and that approximately 200 rooms would be dedicated for staff.

50. During the August Video Conference, Manso, Sosa, Koelemeij, and Garcia stated that Plaintiff's staff was expected and that hotel accommodations would be available for them as part of the Buyout.

51. On August 15, 2022, Manso delivered a "draft contract with regular terms and conditions for a Full Buy Out program at Paradisus Playa Del Carmen and Paradisus La Perla … As mentioned last Friday, all the particular terms and conditions for the Pass Over [sic] program are pending to be added … We will be adding this information during the week". Exhibit "9", August 15, 2022, Manso email ("Email 6").

52. On or about August 23, 2022, Kumul sent an email correspondence delivering an updated contract for the proposed Passover Program Buyout (the "August 23, 2022 Draft Contract"). The August 23, 2022 Draft Contract is attached hereto as Exhibit "10".

53. On August 25, 2022, HPN Global provided comments on the draft contract to Defendants including that the per child price, "should come out ~~we are~~ paying for the buyout with the allotted amount of ppl in each rooms. This is non applicable". *See* Exhibit "11", August 25, 2022, HPN ("Email 7")(strikethrough in original) and "August 25, 2022 Draft Contract" attached hereto as Exhibit "11(a)".

54. To adopt the comment of Email 7, the Final Contract provides, "Children from 5 to 12-year-old: $152.00 per child (maximum of 2 children per room) **The mentioned rates are applicable for pre and post nights and only applicable if this is NOT a buyout.**" Final Contract page 3 (emphasis in original).

55. On or about September 13, 2022, HPN Global communicated to Manso and Sosa additional modifications to the contract, including, among others, "Reservation Procedures- This is a buyout – all rooms will be billed to the Master Account". *See* Exhibit "12", September 13, 2022, HPN email ("Email 8").

56. To adopt the comment of Email 8, the "Reservation procedures" were modified from: "The rooming list will specify which rooms are individual pay own for vendors. The rooming list will also specify which double occupancy rooms are to billed to the master account of the Group" to "All rooms will be billed to the Group Master Account." August 25, 2022 Draft Contract, p. 8 to Final Contract, p. 8.

57. Likewise, modifications to the "No Shows/Early Departures" provision was changed from: "In case of a no-show or early departure the hotel is authorized to charge the total nights of the stay, including taxes and service fees" to, "As this is a buyout agreement, total amount of buyout listed is responsibility of **Danziger** regardless of No Shows and Early Departures,

including all applicable taxes and service fees." *Compare* Draft Contract 9-19-2022, p. 15 attached as Exhibit "13", to Final Contract, p. 15.

58. On October 10, 2022, the Contract was fully executed by the Danzinger and Defendants.

59. On or around November 29, 2022, HPN Global advised Defendants that rooms would be required for some of its Program Staff (including the pastry chef, entertainers and camp counselors) for a pre-event site visit. *See* Exhibit "14", November 29, 2022, HPN email ("Email 9").

60. On March 15, 2023, Gutierrez sent Plaintiffs an email including, among other things, an invoice in the amount of $85,913.80 for 137 extra staff members (the "Extra Staff Invoice").

61. The Extra Staff Invoice was paid by Danzinger.

## VAT Dispute Related Facts

62. On or about February 10, 2023, HPN Global communicated with Defendants regarding, among other things, Danzinger's position that qualified for a VAT refund. *See* Exhibit "15", February 10, 2023, HPN email ("Email 10").

63. Specifically, Email 10 states, "After speaking to some experts that deal with VAT refunds, we qualify" … "What is the procedure for the tax refund?". *See* Exhibit 15.

64. On March 22, 2023, Romero responded to Email 10 and stated, "… *the tax already was declared to the Tax Office (SAT) the hotel is unavailable to modify the status.*" *See* Exhibit "16", March 22, 2023, Romero email ("Email 11").

65. Thereafter, on March 29, 2023, Plaintiff sent a letter to Defendants demanding, among other things, a refund of $1,058,960 in charged VAT taxes (the "VAT Overcharge") and

other damages totaling approximately $1.35M (the "VAT Demand"). *See* Exhibit "17", March 29, 2023.

## Coerced Contract Related Facts

66. On April 2, 2023, the Passover Program commenced at the Hotel.

67. The first night of Passover and the first Seder were scheduled for the evening of April 5, 2023.

68. On April 2, 2023, a Seder seating list was provided to the Defendants to make sure all arrangements were properly made. *See* Exhibit "18", April 3, 2023, Weisman email and attached seating chart ("Email 12").

69. On April 4, 2023, Defendants send a coercive demand letter (the "Coercive Demand") claiming, among other things, 1) 360 more Attendees hotel registrations than were permitted under the Contract; 2) Plaintiff was required to release Defendants from certain claims (the "Coerced Release"); and 3) Plaintiff was responsible for paying an additional $1,334,880 (the "Coerced Payment"). *See* Exhibit "19", April 4, 2023, demand letter.

70. In comical contradiction, the letter is titled "Ref." Group Contract **Full buyout** Passover at Paradisus Playa del Carmen". *Id.* (emphasis added).

71. Defendants demanded that the Coerced Payment be paid by April 4, 2023, the day before the first night of Passover.

72. In anticipation of the Passover, over 2,000 Attendees (including many families with young children), were preparing to participate in the first Seder in the afternoon of April 5, 2023.

73. Hours prior to the commencement of the first Seder, dining rooms were not ready other preparations had not been finalized, and the Seder was at risk of complete failure.

74. If the Seder did not proceed as planned, Plaintiff's business would have suffered catastrophic and irreparable reputational damage.

75. At this time, just a few hours prior to the first Seder, Plaintiff was approached by Jonathan Diaz, on behalf of Defendants, who reiterated the Coercive Demand.

76. Jonathan Diaz threatened, that if Plaintiff did not sign a document agreeing to the Coerced Release and Coerced Payment, that Defendants would not host the Seder.

77. Further, Jonathan Diaz demanded 1) that Morginstin personally guarantee the Coerced Payment; and 2) that Morginstin immediately write a check for the Coerced Payment before Defendants would finalize preparations for the Seder.

78. Plaintiff understood that if the Seder was not successful, that Plaintiff's business would be ruined.

79. Under significant economic duress, Plaintiff signed the document containing the Coerced Release and Coerced Payment (the "Coerced Contract"). The Coerced Contract is attached thereto as Exhibit "20".

## COUNT I FRAUD

80. Plaintiff realleges paragraphs 1 through 79 above and incorporates those allegations by reference.

81. During the discussions with Defendants in advance of the Passover Program, material representations were made to the Plaintiffs by the Defendants, including, among others:

　　a.　The contract was for a full Buyout of the Hotel;

　　b.　The Hotel's maximum capacity was 1,798 adults and 1,127 minors;

　　c.　That Plaintiff's Attendees and staff would have exclusive use of the Hotel during the Passover Program;

   d. That Plaintiff's staff would have accommodations during the Passover Program;

   e. That the all 899 Hotel rooms were pre-paid for by Plaintiff during the Program Dates as part of the Buyout.

 82. The representations of Defendants through their agents were not true when made and were an intentional and willful misstatement of fact or facts that Defendants knew or should have known that the Plaintiffs would rely on to their detriment.

 83. The representations made by Defendants were for the express purpose of enticing Plaintiff to host its Passover Program at the Hotel.

 84. Defendants made misrepresentations of material facts.

 85. Defendants knew or should have known of their falsity.

 86. Defendants had the intent that the representations would induce the Plaintiffs to rely and act on them.

 87. The actions of Defendants constitute fraud.

 88. As a direct and proximate result of Defendants' fraud, the Plaintiffs have been damaged in an amount within the jurisdictional limits of this Court, including the VAT Overcharge.

 WHEREFORE, the Plaintiffs demand judgment against Defendants for an amount within the jurisdictional limits of this Court, as well as any other and further injunctive and/or equitable relief as this Court deems just and proper in order to do justice, and respectfully reserve the right to amend this Complaint to demand punitive damages and to join other parties similarly situated, if and as required.

**COUNT II CONSPIRACY TO COMMIT FRAUD**

89. Plaintiff realleges paragraphs 1 through 79 above and incorporates those allegations by reference.

90. Defendants secretly acted in concert with each other to develop and pursue the scheme detailed above in this Complaint to fraudulently induce the Plaintiffs to commit to hosting the Passover Program at the Hotel for the purpose of creating a situation to coerce Plaintiff to sign the Coerced Contract and pay the Coerced Payment.

91. Defendants and other conspirators, including among others, Sosa and Manso, and others currently unknown to Plaintiffs, unlawfully combined and conspired among themselves, and did attempt to take, use, convert and appropriate the assets of Plaintiff.

92. Defendants and other conspirators, including among others, Sosa and Manso, and others currently unknown to Plaintiffs, committed the overt acts of enticing Plaintiff to fly to Cancun, Mexico with a group of over 2,000 Attendees and then forced Plaintiff to sign the Coerced Contract and charged the VAT Overcharge.

93. At all times as outlined in this Complaint, the Plaintiffs were defrauded by Defendants.

94. The acts of Defendants constitute a civil conspiracy in violation of Florida law.

95. As a direct and proximate result of the civil conspiracy to take, use, convert and appropriate assets of the Plaintiff, the Plaintiff has been damaged in an amount within the jurisdictional limits of this Court, including the VAT Overcharge.

WHEREFORE, the Plaintiff demands judgment against the Defendants for an amount within the jurisdictional limits of this Court, and respectfully reserves the right to amend this Complaint to demand punitive damages and to join other parties similarly situated, if and as required.

## COUNT III FRAUDULENT INDUCEMENT

96. Plaintiff realleges paragraphs 1 through 79 above and incorporates those allegations by reference.

97. Defendants, through their agents, Sosa, Manso, and others made material false statements to Plaintiff.

98. The false statements included, among others, that:

   a. The contract was for a full Buyout of the Hotel;

   b. The Hotel's maximum capacity under the Buyout was 1,798 adults and 1,127 minors;

   c. That Plaintiff's Attendees and staff would have exclusive use of the Hotel during the Passover Program;

   d. That Plaintiff's staff would have accommodations during the Passover Program;

   e. That the all 899 Hotel rooms were pre-paid for by Plaintiff during the Program Dates as part of the Buyout.

99. The false statements were made by the Defendants, through their agents, from May 2022 through and including April 5, 2023.

100. The false statements were designed to entice Plaintiff to fly to Cancun, Mexico with a group of over 2,000 Attendees to create a situation where Plaintiff had no choice but to sign the Coerced Contract and to charge the VAT Overcharge.

101. The false statements were made with the intention of Plaintiff relying on same.

102. Defendants knew or should have known at the time that the statements were false.

103. Plaintiff relied on the false statements.

104. As a direct and proximate result of the false statements, the Plaintiff has been damaged in an amount within the jurisdictional limits of this Court, including the VAT Overcharge.

WHEREFORE, the Plaintiff demands judgment against the Defendants for an amount within the jurisdictional limits of this Court, and respectfully reserves the right to amend this Complaint to demand punitive damages and to join other parties similarly situated, if and as required.

## COUNT IV FRAUDULENT MISREPRESENTATION

105. Plaintiff realleges paragraphs 1 through 79 above and incorporates those allegations by reference.

106. Defendants, through their agents, Sosa, Manso, and others made false statements of material fact to Plaintiff.

107. The false statements included, among others, that:

   a. The contract was for a full Buyout of the Hotel;
   b. The Hotel's maximum capacity under the Buyout was 1,798 adults and 1,127 minors;
   c. That Plaintiff's Attendees and staff would have exclusive use of the Hotel during the Passover Program;
   d. That Plaintiff's staff would have accommodations during the Passover Program;
   e. That the all 899 Hotel rooms were pre-paid for by Plaintiff during the Program Dates as part of the Buyout.

108. Defendants knew or should have known at the time that the statements were false.

109. Defendants made the false statements to induce Plaintiff to act upon such statements.

110. Plaintiff relied on the false statements to the damage of Plaintiff.

111. Plaintiff was damaged on account of the false statements in an amount within the jurisdictional limits, including in the amount of the VAT Overcharge.

WHEREFORE, the Plaintiff demands judgment against the Defendants for an amount within the jurisdictional limits of this Court, and respectfully reserves the right to amend this Complaint to demand punitive damages and to join other parties similarly situated, if and as required.

## COUNT V NEGLIGENT MISREPRESENTATION

112. Plaintiff realleges paragraphs 1 through 79 above and incorporates those allegations by reference.

113. Defendants, through their agents, Sosa, Manso, and others made statements of fact to Plaintiff that they may have believed to be true, but were actually false.

114. The false statements included, among others, that:

   a. The contract was for a full Buyout of the Hotel;

   b. The Hotel's maximum capacity under the Buyout was 1,798 adults and 1,127 minors;

   c. That Plaintiff's Attendees and staff would have exclusive use of the Hotel during the Passover Program;

   d. That Plaintiff's staff would have accommodations during the Passover Program;

e. That the all 899 Hotel rooms were pre-paid for by Plaintiff during the Program Dates as part of the Buyout.

115. Defendants were negligent in making the statement because the Defendant should have known the statement were false.

116. Defendants made the statements with the intention that the Plaintiff would rely on the statements.

117. Plaintiff did reasonably rely on the statements.

118. Plaintiff suffered harm in relying on the false statement including, but not limited to, damages resulting from the Coerced Contract and the VAT Overcharge.

WHEREFORE, the Plaintiff demands judgment against the Defendants for an amount within the jurisdictional limits of this Court, and respectfully reserves the right to amend this Complaint to demand punitive damages and to join other parties similarly situated, if and as required.

**COUNT VI TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP**

119. Plaintiff realleges paragraphs 1 through 79 above and incorporates those allegations by reference.

120. There existed a business relationship between Plaintiffs and the Attendees.

121. Defendants were aware of the existence of the business relationship between Plaintiffs and the Attendees.

122. Defendants intentionally and unjustifiably interfered with the business relationship between Plaintiffs and the Attendees.

123. Defendants failed and refused to deliver food and other necessities for the Seder during the Passover Program unless and until Plaintiffs agreed complied with the Coerced Demand and signed the Coerced Contract.

124. Defendant's intentional and unjustifiable interference with the business relationship between Plaintiffs and the Attendees, coerced Plaintiffs to enter into the Coerced Contract.

125. Defendant's intentional and unjustifiable interference with the business relationship between Plaintiffs and the Attendees, caused the Attendees to lose faith in Plaintiff and the loss of business and business relationships.

126. As a result of Defendant's intentional and unjustifiable interference with the business relationship between Plaintiffs and the Attendees, were harmed including in the amount of the VAT Overcharge..

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants for compensatory damages, lost profits, prejudgment and post-judgment interest, attorneys' fees and other relief as is just, equitable and proper.

## COUNT VII FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (**FDUTPA**)

127. Plaintiff realleges paragraphs 1 through 79 above and incorporates those allegations by reference.

128. Defendant engaged in a deceptive and unfair act in the conduct of its trade or commerce.

129. Defendant deceived Plaintiff into flying to Cancun, Mexico with a group of over 2,000 Attendees to create a situation where Plaintiff had no choice but to sign the Coerced Contract and to pay the VAT Overcharge.

130. Under the Coerced Contract, Defendants claim that Plaintiff owes Defendants $1,334,880.

131. Defendants have made demand for the $1,334,880 and have threatened to pursue unlawful action against Plaintiff to collect same and withheld reimbursement of VAT Overcharge.

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants for compensatory damages, lost profits, prejudgment and post-judgment interest, attorneys' fees and other relief as is just, equitable and proper.

## COUNT IX RESCISSION

132. Plaintiff realleges paragraphs 1 through 79 above and incorporates those allegations by reference.

133. Plaintiff and CCHM entered into the Coerced Contract on or about April 5, 2023.

134. CCHM coerced Plaintiff into signing the Coerced Contract on threat of irreparable business and economic harm during a time of great stress.

135. Plaintiff has rescinded the Coerced Contract and notified Defendants of such rescission.

136. Plaintiff was not benefitted by the Coerced Contract.

137. Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff respectfully requests this court enter a judgment against CCHM rescinding the Coerced Contract and grant other relief as is just, equitable and proper.

Respectfully Submitted,

EDELBOIM LIEBERMAN PLLC
*Counsel to the Plaintiffs*
20200 W. Dixie Hwy, Suite 905
Miami, FL 33180
T: 305-768-9909
F: 305-928-1114
Email: brett@elrolaw.com

By /s/: *Brett D. Lieberman*
Morgan B. Edelboim (FBN 40955)
Brett D. Lieberman (FBN 69583)